Minute Order Form (06/97)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8211 | **DATE** | 6/26/2001 |
| **CASE TITLE** | USA ex rel. Tod Harding vs. Cowan | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due_____. Reply to answer brief due_____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry]   Enter memorandum opinion and order. In accordance with 28 U.S.C. §2254(d), the Court grants Tod Harding's petition for a writ of habeas corpus and orders respondent to release Harding from custody unless, within 30 days from the entry of this Order, the State of Illinois announces its intention to retry Harding or files a notice of appeal. The Clerk is directed to enter judgment in favor of the petitioner. |
| (11) | ■ | [For further detail see order attached to the original minute order.] |

| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | JUN 27 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 18 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 01 JUN 26 PM 5:55 | | |
| JD courtroom deputy's initials | | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

UNITED STATES OF AMERICA, ex rel. )
TOD HARDING, )
             Petitioner, )
     v. )   Case No.   99 C 8211
ROGER COWAN, Warden, )
             Respondent. )

**DOCKETED JUN 2 7 2001**

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

### FACTS & PROCEDURAL HISTORY

Tod Harding, his brother Gerald Harding and his cousin James Harland hatched a plan to steal guns from John Miller, the Hardings' uncle. The plan went awry, however, when they discovered that George Miller, Uncle John's mildly retarded son, was home when they got there. George was shot at least ten times and died. All three were eventually charged with murder, felony murder and residential burglary. Tod Harding's case was tried to a jury in Rock Island County, and Harland, who was still under indictment, testified against him. Specifically, Harland testified that he was outside loading stolen guns into the car when he heard shots and then saw Harding emerge from the house with blood on his hands, saying that he had been forced to shoot his cousin because he had recognized him and Gerald. On cross examination, Harding's attorney specifically asked Harland if he had asked for or been promised anything in exchange for his testimony against Harding; Harland testified that he had not.

In addition to Harland, the state presented several witnesses who purchased or received



from Harland guns they later learned were stolen from the Millers' house; for the most part, those witnesses said that Tod Harding had been with Harland when he delivered the guns, but that Harland initiated and handled the deals. The state also presented the crime scene investigators and technicians who painted a picture of what went on at the Millers' house the night of the burglary; none of these people said anything that would suggest that Tod Harding had actually been the one to pull the trigger on his cousin, and none of the state's forensic evidence established that Harding had even been in the Millers' house that night. In other words, Harland was the only witness to put Harding at the scene, he was the only witness to give Harding a motive to kill George Miller, and he was the only witness to say that Harding had committed the murder for which all three men were charged.

Harding testified in his own defense; he stated that on the night of the burglary he did not even go to the Miller's house, he did not shoot George Miller, and he honestly had no idea who did shoot him.

In his closing argument, the prosecutor was forced to concede that Harland was an important witness for the state. He argued that the jury should believe Harland because he had nothing to gain from testifying against Harding. The jury convicted Harding of all three counts, and the trial judge sentenced him to natural life on the murder count and an extended term of twenty-five years on the burglary count.

After Harding's trial, Harland concluded a deal under which the murder charges against him were dismissed, he pled guilty to residential burglary and concealing a homicidal death, and he was sentenced to ten years in prison. R. at C247, C250-51.

Harding appealed only his sentence; the Illinois appellate court reduced the burglary

2

sentence to fifteen years and affirmed the judgment as modified. Harding filed a petition for leave to appeal to the Illinois Supreme Court, which the court denied. Harding then filed a *pro se* petition for post-conviction relief, arguing that he was deprived of a fair trial because the prosecutor knew Harland was lying when he testified at trial that he had not been promised anything in exchange for his testimony, yet he failed to correct those lies. Harding also argued that he was denied a fair trial because the prosecution cut a deal with Harland but failed to disclose that fact, the judge denied his change of venue request, and his attorney was ineffective. The court appointed a lawyer to represent Harding in post-conviction proceedings, and his lawyer filed an amended petition arguing that his trial counsel had been ineffective in failing to interview and call certain witnesses who could have undermined Harland's credibility; the amended petition also reiterated that the prosecution failed to disclose its deal with Harland. To support his amended post-conviction petition, Harding introduced three affidavits, only one of which--that of James Harland--is relevant for purposes of Harding's habeas corpus petition. In his affidavit, Harland stated that before he testified against Harding, he "discussed my case with my attorney and the prosecutor" and that "during those discussions . . . I was reassured that my testimony would benefit me in my case." R. at C232 (Amended Post-Conviction Petition, Exhibit C).

The state answered the petition, denying the existence of any agreement with Harland and submitting affidavits from Harland's attorney and the prosecutor in both the Harding and the Harland cases. R. at C235, C245-51.[1] Harland's attorney stated that he had discussed the case

---

[1] By the time Harding's post-conviction petition was heard by the trial judge, both the trial prosecutor and Harland's attorney (who submitted affidavits in opposition to the petition) had been appointed to the bench and were sitting judges in Rock Island County.

3

with his client and agreed that the evidence might be sufficient to convict Harland of murder. R. at C196. He stated that he "spoke with [the prosecutor] in an attempt to obtain a negotiated disposition in James Harland's case in exchange for his testimony," but no "negotiation" was "reached" prior to trial because the prosecutor refused to negotiate. R. at C197. Nevertheless, Harland's attorney stated, he "advised Harland to give full cooperation and testimony as that testimony would mitigate Harland's accountability for the charge of murder and would serve as a substantial mitigating factor in the disposition of the case." *Id.* He stated that, on his advice, Harland testified against Harding "without benefit of any promise or plea negotiation other than the knowledge of his cooperation will be taken into account by the Court and the State's Attorney when his cases were eventually disposed." *Id.* For his part, the prosecutor stated that Harland's attorney contacted him about "the possibility of a plea agreement and reduced charges for James Harland in exchange for his testimony against co-defendants." R. at C193. The prosecutor stated that he "did not engage in plea negotiations at that time, but instead informed James Harland through his Attorney that if Harland was not the person who physically fired the gun and he provided truthful testimony against co-defendants, that his cooperation would be considered by both the State and the Court." *Id.* As we have noted, after Harland testified, the prosecutor dismissed the murder charges against him and agreed to a ten-year sentence on lesser charges. *Id.* at C194.

The state moved for summary judgment on the claim concerning its failure to disclose any deal with Harland, and the trial judge granted that motion. The court explained its reasoning in a supplemental opinion:

Defendant contends that had the jury known James Harlan [sic] expected

4

something in return for his testimony, they would have reached another verdict. The Court indicated in its oral remarks that I considered it inconceivable that the jury would not have figured that out. The closing remarks of Attorney Jerry Schick [Harding's defense attorney at trial] clearly indicate that James Harlan, in giving his testimony had something to gain. R. at C209.

Harding, still represented by counsel, appealed the trial court's summary judgment decision, arguing that the court erred when it refused to grant him a new trial because of the state's failure to correct Harland's perjured testimony. After reviewing Harland's trial testimony and the affidavits submitted in post-conviction proceedings, the appellate court affirmed the denial of post-conviction relief, concluding that "the State's Attorney's ephemeral promise and Harland's vague testimony" were not enough to support a conclusion that "the State obtained the defendant's conviction by knowingly using perjured testimony." Exhibit J to Respondent's Answer, p. 7. Harding filed a *pro se* petition for leave to appeal in the Illinois Supreme Court, which was denied. *See* Exhibits K and L to Respondent's Answer.

## ANALYSIS

After exhausting his state remedies, Harding filed in this court a *pro se* petition for habeas corpus relief. Harding first claims that he is entitled to such relief because the trial court erred when it counted the brutality of his crime as an aggravating factor at sentencing; he argues that this constituted, in effect, double counting because he was convicted of first degree murder, which by its very nature is heinous and causes great bodily harm. This claim is not cognizable on federal habeas corpus. The question of whether a state court correctly applied its own law cannot, by itself, form the basis of a habeas action. *See Biskup v. McCaughtry*, 20 F.3d 245, 247 (7th Cir. 1994). *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In

conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Harding also argues that he is entitled to habeas corpus relief because the state failed to correct what it knew to be false testimony by Harland during cross examination at trial. Because the Illinois appellate court resolved this claim on the merits in post-conviction proceedings, we cannot grant habeas relief unless, after the closest examination of the state court judgment, we are "firmly convinced that a federal constitutional right has been violated." *Williams v. Taylor*, 529 U.S. 362, 389 (2000). We may issue the writ of habeas corpus only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. §2254(d)(1), or if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2). As to the first test, a state court decision is "contrary to" Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," *Williams*, 529 U.S. at 405, or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent," *id.* at 406; a state court unreasonably applies clearly established law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id.* at 406-07. As to the second test, a state court decision involves an "unreasonable application" of Federal law if it is "at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary, that a writ must issue." *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997).

6

After carefully reviewing the record, the Court is persuaded that in Harding's case these stringent standards are satisfied. "As long ago as *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), [the Supreme Court] made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972). At trial, on cross examination by Harding's attorney, Harland testified as follows:

> Q: Have you been promised anything in return for your testimony?
> A: No sir.
> Q: Have you asked for anything in return for your testimony?
> A: No sir.
> Q: That is you asked your attorney if you will get anything in return for your testimony?
> A: Not really, so sir.
> Q: Well, not really, what have you asked him?
> A: I just asked him, you know, if I am going to get charged for a murder that I have not done.
> Q: Do you think the murder charge is going to be dropped against you in return for your testimony?
> A: No, sir.
> Q: Is that why you are testifying?
> A: No, sir. (R. at 338-39; Exhibit J to Respondent's Answer, pp. 2-3)

In denying Harding's post-conviction petition, the trial court made no specific findings concerning the truth or falsity of Harland's testimony; instead, it concluded that any impeachment evidence was immaterial because it was "inconceivable" that the jury would not have figured out that Harland had something to gain from testifying against Harding. *See People v. Tod Harding*, No. 84 CF 524, Memo Opinion Supplementing Order Granting Summary Judgment (Feb. 6, 1997). But the appellate court did address the question of whether Harland's testimony was, in fact, false. The appellate court found that the prosecutor's promises were too "ephemeral" and Harland's testimony too "vague" to support a finding that the prosecutor

7

knowingly put on false testimony. *People v. Harding*, No. 3-97-0154, Order affirming denial of post-conviction relief (Oct. 14, 1998).

The appellate court's finding was unreasonable in light of the evidence presented. The affidavits submitted in post-conviction proceedings demonstrate beyond dispute that at least two of the answers Harland gave on cross examination were false, and that the prosecutor knew this to be the case. First, the affidavits show that Harland *was* promised something in return for his testimony: Harland stated in his affidavit that he was "reassured that my testimony would benefit me in my case"; his attorney stated that his client was promised that "his cooperation will be taken into account by the Court and the State's Attorney when his cases were eventually disposed"; the prosecutor said he "informed" Harland that "his cooperation would be considered by both the State and the Court." Thus, although Harland did not have a plea agreement in hand when he testified against Harding, all the participants agree that he had been promised that the prosecutor and the court would consider his cooperation and that his testimony would help his case. Thus when Harland testified that he had not been promised anything, his testimony was literally untrue and known by the prosecutor to be untrue.

The affidavits also make clear that Harland's answer to the second question quoted above–whether he had asked for anything in return for his testimony–was likewise false. Harland's attorney admitted that before Harland testified, he went to the prosecutor "in an attempt to obtain a negotiated disposition in James Harland's case in exchange for his testimony." R. at C197. And the prosecutor agreed that Harland's attorney came to him and "inquired regarding the possibility of a plea agreement and reduced charges for James Harland in exchange for his testimony against co-defendants." *Id.* at C193. Again, all the participants agree

8

that Harland asked for consideration in return for his testimony. His contrary answer was untrue and was known by the prosecutor to be untrue.

In sum, there was certainly nothing "vague" about Harland's testimony on these points, and there was nothing "ephemeral" about the understanding he had with the prosecution. Harland asked for something in return for his testimony--something the prosecutor was uniquely empowered to deliver: the dismissal of murder charges--and the prosecutor promised that if Harland testified against Harding, the prosecutor would take his cooperation into account in dealing with Harland later. The state may not have had a signed agreement with Harland, but everyone involved certainly understood that if Harland took the stand and fingered Harding for the murder with which both men were charged, he was going to get something in return. Even if no specific consideration had been promised, it was never disclosed to the jury that Harland had asked to have the murder charge dropped in return for his testimony and had effectively been told that that was a possibility. The appellate court's conclusions were utterly inconsistent with the record evidence and were therefore unreasonable. *See Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997) (the test for reasonableness is "whether the [state court's] determination is at least minimally consistent with the facts and circumstances of the case").

In *United States v. Bagley*, the government told defense counsel that no "deals, promises or inducements" had been made with or to the government's two principal witnesses. 473 U.S. 667, 670 (1985). As it turned out, however, before testifying at trial each witness had been given a blank contract which stated that in exchange for giving information and "upon the accomplishment of the objective sought to be obtained by the use of such information to the satisfaction of said Regional Director, the United States will pay to said vendor a sum

9

commensurate with services and information rendered." *Id.* at 671. The witnesses ultimately received $300 each for their testimony, though this amount was not settled upon until after Bagley was convicted. *Id.* at 672. The Supreme Court found that the *possibility* of the reward held out to the witnesses "gave [them] a direct, personal stake in Bagley's conviction" and should have been disclosed. *Id.* at 683. Notably for our purposes, the Court held that the fact that the witnesses did not have a signed deal at the time of trial did not mean there had been no promise, deal or inducement; indeed, it held that the fact "that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, only served to strengthen any incentive to testify falsely in order to secure a conviction." *Id.* The same is true in this case. Harland did not have a signed plea agreement. But he did have a powerful inducement to testify–falsely if necessary–against Harding: he had the prosecutor's promise, elicited in response to a request for reduced or dismissed charges, that if he testified against Harding the state would consider that cooperation in resolving his case. What Harland asked for–the dismissal of murder charges–was within the prosecutor's exclusive power to provide; indeed, in the end, the prosecutor delivered, dismissing the murder charges against Harland. Under *Bagley*, the prosecutor was obliged to correct Harland's testimony; his failure to do so–especially taken in combination with his comments during closing argument that Harland had nothing to gain from implicating Harding–amounted to the knowing presentation of false testimony.

Our conclusion on this issue does not automatically mean Harding is entitled to relief. "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 271

(1959)); *United States v. Agurs*, 427 U.S. 97, 103 (1976), *quoted in Kyles v. Whitley*, 514 U.S. 419, 433 n.7 (1995). Although he did not discuss *Giglio* or *Napue*, the trial judge concluded that Harland's testimony, even if false, would not have affected the jury's judgment because, according to the court, it was "inconceivable that the jury would not have figured . . . out [that Harland expected something in return for his testimony]." R. at C209. This decision could not be more wrong under *Napue v. Illinois*, 360 U.S. 264 (1959).

In *Napue*, the defendant was charged with murder. At his trial, George Hamer, the state's principal witness and a man doing time for the same murder with which Napue was charged, testified in response to a question by the prosecutor that he had received no promise of consideration in return for his testimony. In fact, the state's attorney had promised Hamer that if he testified against Napue, he would recommend that Hamer's sentence be reduced. *Id.* at 266-67. Significantly, though Hamer denied getting anything in exchange for his testimony, he admitted that a public defender had promised to "do what he could" for Hamer, which means that the jury in *Napue*, unlike the jury that heard Harding's case, at least had some hard evidence that Hamer might be testifying out of personal interest. *Id.* at 265. When Napue found out about the prosecutor's deal with Hamer, he filed a post-conviction petition arguing that the state had knowingly put on false testimony to secure his conviction. *Id.* at 267. The trial court found that the prosecutor had promised to help Hamer only if Hamer's testimony turned out to be truthful and denied Napue relief on that basis. *Id.* The Illinois Supreme Court found, contrary to the trial court, that Hamer lied on the stand and that the prosecutor knew it; it nevertheless affirmed the denial of relief because the jury was otherwise advised that Hamer was trying to get something for his testimony. *Id.* at 267-68. In short, like the trial judge in Harding's case, the court

11

concluded that because the jury already realized Hamer had an incentive to lie, it did not matter whether it knew the full story.

The United States Supreme Court reversed. In so doing, the Court first reiterated that "a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and that "the same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* at 269 (citations omitted). Most importantly for purposes of Harding's case, the Court held that "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of a witness"; "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Id.* And the Court specifically rejected the position adopted by the trial judge in Harding's case: "we do not believe that the fact that the jury was apprised of other grounds for believing that the witness Hamer may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one." *Id.* at 270. This was so in *Napue* even thought the jury was actually given a hint of the witness' incentive to lie. Thus, contrary to the trial court's decision, the fact that the jury might have been able to figure out on its own that Harland was testifying out of "self-preservation" did nothing to cure the constitutional infirmity resulting from his false testimony.

Contrary to the trial court's conclusion, there is every reason to believe that Harland's false testimony affected the jury's judgment. Harland was the key witness for the prosecution.

12

Although other witnesses linked Harding to the guns the trio stole the night of the murder, only Harland put Harding at the Millers' house the night of the murder, only Harland gave Harding a motive to kill George Miller, and only Harland identified Harding as the victim's executioner. His credibility was therefore crucial to the state's case, and Harding's inability to impeach Harland before the jury very well could have made the difference between a guilty verdict and an acquittal; certainly the situation "undermines [our] confidence in the outcome of [Harding's] trial." *See Bagley*, 473 U.S. at 678; *Kyles*, 514 U.S. at 434.

The Seventh Circuit's decision in *United States v. Boyd* instructs that the question of whether perjured testimony had a prejudicial impact in a given case is resolved by asking two more questions: "Is there some reasonable probability that the jury would have acquitted the defendant[] on at least some of the counts against [him] had the jury disbelieved the essential testimony of [the lying witness]? And might the jury have disbelieved that testimony if the witness[] hadn't perjured [himself] . . . ." 55 F.3d 239, 245 (7th Cir. 1995).[2] As in *Boyd*, we answer both questions affirmatively. Without Harland, the state's murder case against Harding was extremely flimsy. On the burglary charge the state had nothing but circumstantial evidence; on the murder charge it had even less. Without Harland to place Harding in the midst of the burglary, to give Harding motive and to say that Harding pulled the trigger, the jury likely would have acquitted Harding on at least the murder charge.[3] And had the jury known Harland was

---

[2] Although *Boyd* involved a direct appeal of a federal conviction, its reasoning applies in this case. *See Shasteen v. Saver*, — F.3d —, No. 99-2154, 2001 WL 608859 (7th Cir. June 5, 2001) (applying *Boyd*'s false testimony analysis in a habeas corpus case challenging a state court conviction).

[3] Although Harding was charged with both felony murder and murder, the state has not argued that any error resulting from Harland's testimony identifying Harding as the actual

13

lying about what he had to gain from testifying, it might have disbelieved his testimony about everything else as well. Like the witnesses in *Bagley*, Harland had a personal stake in seeing Harding convicted of George Miller's murder. If he helped convince the jury to convict Harding, Harland had every reason to think the prosecutor would dismiss the murder charges against him. That carrot was far more compelling than the paltry cash prize dangled before Bagley's accusers.

In *United States v. Bigeleisen*, 625 F.2d 203 (8th Cir. 1980), the key government witness denied at trial that he had any agreement with the government concerning his cooperation when in fact in exchange for his testimony the government had agreed to "make known to the sentencing judge . . . whatever his cooperation is." *Id.* at 205. Despite this agreement, the government failed to correct the witness' testimony; on the contrary, in his closing argument the prosecutor capitalized on the false testimony, arguing to the jury that the witness' plea bargain had nothing to do with his testimony. *Id.* at 206. In reversing the conviction and remanding for a new trial, the Eighth Circuit held that the "government's silence about [the witness], in context, implied that [he] made no agreement." *Id.* at 208. The court concluded that there was a reasonable likelihood that the false testimony and the misleading closing argument affected the judgment of the jury:

> As the Supreme Court said in *Napue*, the possible interest of a witness in testifying falsely may determine guilt or innocence. Here, Moore's testimony was the linchpin in the government's case, and the jury was entitled to know the extent of his interest in testifying falsely against Bigeleisen. Whether he had an agreement regarding his testimony was central to the jury's credibility evaluation. In view of Moore's testimony and the government's closing argument, the jury

---

murderer would be harmless because of the felony murder count. In fact, in his closing argument, the prosecutor said that the state had undertaken the burden of proving that Harding was the shooter: "we're alleging in our theory of the case that this person is in fact the shooter in this case." R. at 757.

14

> could reasonably have believed that no agreement existed. In these
> circumstances, the jury could not have properly evaluated Moore's credibility, and
> there is a reasonable likelihood that its verdict was thereby affected. *Id.* at 208-09.

The same is true in this case. Harland's testimony was the linchpin of the government's case; without him, the state could not put Harding at the scene, let alone identify him as George Miller's executioner. Nevertheless, the prosecutor sat by silently when Harland told the defense attorney, the court and the jury that he had neither asked for, nor received, any promises in exchange for his testimony. Not only that, but like the prosecutor in *Bigeleisen*, the prosecutor in Harding's case capitalized on Harland's false testimony in his closing argument by arguing to the jury that Harland had nothing to gain by pointing the finger at Harding. *See* R. at 811 ("And what does Jimmy Harlan [sic] have to gain by implicating him? He can implicate anybody."). Taken together, Harland's false testimony and the prosecutor's remarks in closing argument provided the jury with a misleading impression of Harland's motives for testifying; certainly we cannot say that the record provided the jury with the evidence necessary to evaluate Harland's credibility as a witness.

## CONCLUSION

For the reasons explained above, the Court finds that the prosecutor knowingly used false testimony to secure a conviction against Tod Harding. The appellate court's finding to the contrary was both unreasonable in light of the evidence presented and based on unreasonable application of established Supreme Court precedent, notably *United States v. Bagley*. Additionally the trial court's decision that the testimony, even if false, would not have affected the jury's judgment was contrary to the Supreme Court's decision in *Napue v. Illinois*. The Court further finds that Harland's false testimony, especially when viewed in light of the prosecutor's

remarks in closing argument, likely affected the judgment of the jury and undermines our confidence in the jury's verdict. In accordance with 28 U.S.C. §2254(d), the Court grants Tod Harding's petition for a writ of habeas corpus [1-1] and orders respondent to release Harding from custody unless, within 30 days from the entry of this Order, the State of Illinois announces its intention to retry Harding or files a notice of appeal. The Clerk is directed to enter judgment in favor of petitioner.

Dated: June 26, 2001

MATTHEW F. KENNELLY
United States District Judge